If you could call the case, Madam Clerk. 11-14-83, people want to see Sean Whirl. All right, council could approach who are going to argue. Tell us who you are and who you represent. Good morning, your honors. My name is Flint Taylor, that's F-L-I-N-T-T-A-Y-L-L-Y, and I represent the appellant, Sean Whirl. Good morning, I am Brian Stepnich, and I work for Stuart Nudelman's office, from the special prosecutor's office, and I represent the people of the state of Illinois. Okay. Typically we go 15 minutes to 15 minutes, but, you know, we have time, there's nobody coming in after you, so we'll be liberal. You know, maybe you can double that, maybe you need a little bit more time, we probably won't give you much grief about that, so go ahead. Thanks. May I proceed? You may. Thank you. Your honors, this is an area two police torture case. We're here on a combined petition. We're here on a post-conviction petition, and we're here also on a Turk torture inquiry and relief commission hearing. So what we have is a combined hearing in the court below on both of those areas. Fundamentally, what do you see as the difference between a Turk hearing and a third stage evidentiary hearing? I don't think we see a whole lot of difference, your honor. We see that there's a preponderance of the evidence standard that should be employed. We see that at heart of both of these hearings were whether, in fact, there was evidence, by preponderance of the evidence, that Mr. Royal was tortured into giving a confession, and as a result, whether he should have a new trial and particularly a new motion to suppress hearing based on the fact of all the newly discovered evidence that both the Turk found and that the court on the stage two found entitled him to the hearing. So although the Turk isn't particularly clear on what the nature of it is, it seems to be very similar to a post-conviction third stage evidentiary hearing, and I think that's the way we proceeded below, and I think that's the way the court proceeded below. In that particular hearing or hearings, the court's proper role would have been to employ an objective standard to determine whether, looking at all of the newly discovered evidence, whether there was a pattern of torture in that newly discovered evidence of which Pienta, who was the torturer alleged in Mr. Royal's case, was a participant, and whether all of that evidence and all of the other evidence that we presented would make it probable that on a new motion to suppress, that he would have won that motion to suppress and that he would have then had his confession suppressed. And it's opposition that the court did not properly look at the case from that lens, but rather he ignored that lens. He weighed evidence inappropriately. He applied the wrong legal standards along the way to our evidence, and instead he almost exclusively looked at the one major witness who did take the stand, and that was Sean Will. He looked at Sean Will, and he then started to deal with various impeachment, and he, looking not as a whole to all the evidence to determine the credibility of whether he was tortured based on the newly discovered evidence, he decided solely on Mr. Royal's testimony and the impeachment of Mr. Royal that he wasn't, quote, credible. And as a result, he made a manifest error or a series of manifest errors in looking at the facts, and not only did he make manifest errors of law, but he applied and inappropriately applied standards out of various cases having to do with the evidence that we submitted. So I'd like to review with the court the evidence that we presented, because basically we presented all the evidence at this hearing. If you look at that evidence as a whole, first, the officer who allegedly tortured and who Mr. Royal said has said consistently from the beginning, tortured him into giving this confession, is a man by the name of James Pienta. James Pienta was an LA2 detective. He started out with John Burge in 1972, which is 18, 17 years before Mr. Royal was tortured. And we then put forward a pattern that showed at various points in that 17-year period that Pienta was involved in various actions, various torturous confession activities over that 17-year period, leading up to 1990, which was at the very end of Burge's reign. But at that point, Burge was still a commander at another area at that time, Area 3. So we put on that evidence. We showed that he was involved in that pattern in practice since 1973. But the court roughed off that evidence. He said, well, he wasn't a central figure in many of these cases. Well, first of all, we look at the People v. Jakes case. And that case says you don't have to be a central figure in the torture. If you're there and you turn your back on it and you hand him a bag or you don't testify about it or you make some comments or you go into the next room to get the confession from the other guy or if you play good guy, bad guy, are you a central figure? Well, in that sense, maybe you're not a central figure. But he also didn't look at the evidence correctly in terms of the cases that he said he wasn't a central figure in. If you look briefly at the Holmes case, that's the first case in 1973. We had evidence that Holmes was arrested and his family was brutalized at the scene. There was no contest that Pienta was there. And then Holmes said they brought him back and they tortured him with electric shock and with a bag over his head. And he said the guys who arrested him were in the room with Burge when Burge did that. And so that was our evidence that Pienta was involved. The judge said, well, it wasn't clear that he was involved in that case. Well, when we asked Burge whether Pienta was involved, what did he do? He took the Fifth Amendment. When we asked Pienta, were you involved, what did he do? He took the Fifth Amendment. Yet the judge refused to draw any inference for Holmes' Fifth Amendment takings. To me, and it seems to me to this court, when you're looking at that evidence, that's strong evidence that Pienta was involved in that case. Very similar with the Andrew Wilson case, the notorious Andrew Wilson case. Uncontested that Pienta was with Burge at the scene when they arrested Andrew Wilson. They brought Andrew Wilson back to the station. Burge said, we'll get him at the station. They got him back to the station, and Wilson says the same guys who arrested him beat him up initially, put a bag over his head, burned him with a cigarette, and kicked him in the eye. And he says that the same guys who arrested him did that. And he says, the fat guy kicked me in the eye. Now, the fat guy is Pienta. Pienta weighed over 300 pounds. There was no other, quote, fat guys in the room. Yet the judge ignored that and said, well, we don't really know whether and to what degree Pienta was a central figure in that case as well. So that deals with the first way that the judge didn't deal correctly with the evidence. He also, in terms of the pattern, he ignored Judge Hooks. Judge Hooks looked at Pienta's evidence in the Cain case. Cain is the case that we put on evidence. It happened three or three years before Mr. Wills' torture. And, in fact, it was uncontested that Pienta was involved in that and involved in the brutality. Judge Hooks found, gave a new hearing that ultimately exonerated Cain on the basis of what he found to be a pattern in practice that, in fact, he said that Madigan and Pienta were involved in. Now, is the Cain case the closest in time to Mr. Wills' torture? There's two others that are closer by six months. The closest one that we were able to put on evidence was the Houston and Cleveland case, which was in October of 86, which is three and a half years. So I wanted to call, of course, attention to Reyes, the People v. Reyes case. And in that case, the timing was three cases, and I believe it was like 15, 10, and 5. I may have a year off or so, but I think the closest one was five years. Here we have 17 years, 8 years, 5 years, 4 years, 4 years, 3 and a half years, and 3 and a half years. And what we also have in this case, Your Honors, is we were able to get from the Houston case an interrogatory answer that Pienta signed many years ago before he started to take the Fifth, in which he admitted to 15 to 25 other disciplinary cases that were lodged against him in the Chicago Police Department. Now, when we asked him about those or any of those torture cases or any of those during that time period, I mean, he's been a detective for decades, he took the Fifth Amendment. So we were able to put that evidence on, but we weren't able to do anything with that evidence to further elaborate on how many, if any, of those 15 to 25 additional cases. So the judge's finding that this was too remote, that the fact that Wuerl happened in 90 and the cases stemmed back, as your Honor asked, in the way that I just mentioned, that is wrong. That is manifestly in error as well. Now, he also made a big deal out of the fact that Burge was no longer at Area 2 in 1990. We don't contest that, but what we did was put on quite a bit of evidence to show how that pattern continued even though Burge left. Let me say initially that the Turk thought it was significant because under their various rules, it says that only cases under the supervision or command of John Burge are to be referred out. And they referred this case out because their interpretation of supervision and command included the circumstance that Wuerl was in. That's number one. Number two, we put on evidence that it continued through three or four other detectives, including McDermott. McDermott was the guy who testified against Burge in the federal trial, and McDermott ultimately admitted that he was involved in perjury and brutality after Burge left. We put on evidence about Palladino, another Burge associate who continued to hit the dirty work after Burge left and was promoted, by the way, to Area 3 as commander. It wasn't like he was fired out of Area 2. He was promoted to bomb and arson, and then he was promoted to Area 3 as commander. And we also put on a third detective in evidence of his involvement and continuing. We also put on the guy who took Burge's place. A lieutenant by the name of Phil Klein, who you might recognize the name, went on to be superintendent. Well, we put on evidence that Phil Klein never did anything to deal with what was going on at Area 2. He never questioned anybody. He never called anybody on the copy. He never changed anything. So you have that continuing pattern in practice. And at least as of 1990, Burge is a commander. These guys at that point knew that they could do it with impunity. It was only later that Burge was fired. If you wanted to draw a line, a bright line in terms of when you might say that the pattern in practice could no longer be considered, you might draw it after Burge got fired because you could say that these detectives then got the message, if they did, that perhaps they shouldn't be doing this kind of torture anymore. But until then, they saw the main guy, their boss, getting promoted and getting accolades for what he was doing. So the judge was wrong on that as well. I'm sorry. I know you're on a roll here. You mentioned that your position is that Judge Alonzo, in focusing on Mr. Wuerl's credibility, employed the wrong standard. Do any inconsistencies between Wuerl's accounts of events play a role in a third stage evidentiary hearing? Well, I think that any witness's testimony plays a role. I don't think that he was necessarily wrong in looking at Wuerl's testimony. I think he was wrong in the weight that he gave to the impeachment of Mr. Wuerl. And if you look carefully at what he does, and you could therefore look at the record, it's not like he says he had a bad demeanor, he was looking down at the floor, he didn't look like he could answer the questions. He dealt strictly with impeachment that came out of prior proceedings. But Mr. Wuerl, unlike Pianta and others, he took the stand and he faced up to those contradictions. And in our reply brief, I think we explain those contradictions in a way that shows that the heart of what Mr. Wuerl was testifying about was accurate. And it was only corroborated by all the other evidence. And that's another thing that the judge didn't take into account. And you made that argument to the judge that you make in the reply?  Well, I don't know that the issue, and that's a good question. And I don't know that I can totally answer that without reading my argument. But I think that it didn't seem like that was the real issue that we were dealing with below. It didn't seem like, obviously, we needed to tell the judge and explain to him, like we did in the briefs, why we felt that Mr. Wuerl was telling the truth. But in terms of the focus that we were putting on the case, it's the same kind of focus that I'm talking to you now. We're talking about the newly discovered evidence. And that brings me to the Fifth Amendment. And I think that in and of itself, Your Honors, is a point that would require reversal. At the very least, to send this back for the court to properly employ an inference here. Now, the U.S. Supreme Court says under Baxter that you can, in a civil case, employ a Fifth Amendment inference against the party or the witness who's employing it. And the judge didn't even reach that question. He didn't even give us any rationale for why he didn't use it. But he clearly didn't use it, did not use it. And how could there be a better choice? How do you know that if he didn't mention it? Well, because he doesn't discuss, well, Pianta took the Fifth, but he doesn't say, even though Pianta didn't step in front of me, I still credit Sean Wuerl. You have to infer from his decision that he didn't give any weight to the Fifth that was taken by Pianta. He didn't focus on the credibility of the state's case. He didn't focus on the credibility of the idea of whether the man was tortured. He focused only on Mr. Wuerl. If we just focus in on one issue, do you think that's just enough to send it back? I do. I think that the Fifth in and of itself is enough, but I think we have a whole lot more. I'm not. But, I mean, not only should you draw influence, but think about the fact that if I were to take him to Fifth, they just denied Mr. Wuerl the right to confrontation. When you think about it, he couldn't confront Pianta with 25 years of torture. What he did confront, or I confronted Pianta with, was did you scrape the key over his leg? I take the Fifth Amendment. Did you torture? Were you in the room when Anthony Holmes was tortured? I take the Fifth. And not only did he take the Fifth that time, he took it in the past, and Burge took it, and we showed that to the judge, and all the other detectives that were in the rooms in all those other cases in all those years that I've mentioned, they all took the Fifth, and there was a stipulation that if called again, they'd take the Fifth again. So hypothetically, if Mr. Wuerl had another suppression hearing, it's undisputed in this record, I think, that he sustained an injury while he was in police custody. And so the state would bear the burden of proving at a suppression hearing, by clear and convincing evidence, that his confession was not a product of that torture. Could the state prevail if Pianta then came into that hearing and took the Fifth? No, I don't think so, but the standard isn't absolute. The standard is, would it probably be different? And I think that all of us would say, yes, it would probably be different. The judge, Judge Alonzo, made another fundamental mistake. He said, well, Judge Cousins found Mr. Wuerl not to be credible. And he relied on that. Well, the whole point is not to rely on Judge Cousins finding him 20 years ago, but to step in his shoes now and say, would the result be different if Judge Cousins had X, Y, and Z, as you asked? And X would be the Fifth Amendment, Y would be this pattern of torture, and Z would be Pianta's role in all of this. And it would seem to me that it would be extremely hard for any reviewing court or for any objective, reasonable person looking at this to say that the result might not or probably would not be different, given what we know with regard to Pianta and what we know now with regard to his involvement in all of this, and, as I said before, the Fifth Amendment. The Fifth Amendment and the inference that even though the Supreme Court said you don't have to draw that inference, I mean, there's got to be circumstances where you're compelled to draw it. And if there's another situation that's more compelling for drawing an inference than this case, I haven't seen it yet. And to me, that's why I raise this as a fundamental mistake by the court. And also, the court ignored completely the Turk's findings. Even though we didn't argue, although some Turk petitioners have argued some kind of argument about collateral estoppel or res judicata, I don't think that applies. But I do think that there should have been some deference given to the fact that this wasn't just another PC hearing, but this was a PC hearing and a Turk hearing, and the Turk had done an investigation, and it had made findings preliminarily that were similar to the evidence and to what we were urging the court as well. So that is another mistake that the court made. And on the other side of the ledger, we put on the brother, the brother who was a retired army man, who came to the scene and talked to him, and there was an outcry and showed him the injury. The court chose to say, well, that he said the injury was on the front of the shin, and the injury was actually a little bit more on the ankle. A minor kind of impeachment over 30 years, but that was the kind of thing that the judge was doing, and I think in error in terms of when he was looking only at Mr. Wuerl's evidence. And the girlfriend, we put on, we reintroduced what she testified at the hearing about hearing screams. The mother, we put on her evidence. We didn't put her on, but we put on the picture. She saw the picture and said it looked different than this preexisting wound. Those photographs are nowhere to be found. They're nowhere to be found, and unfortunately you find this to be the case in a lot of these cases 20 years later. We just did another case, and we were all looking for another piece of evidence. I think it was a photograph as well, and somehow over the many years these kind of things disappeared. You don't put any, nobody argues necessarily that it's one side's fault or the other, but the person who ultimately suffers is the petitioner as he would hear. And what did we have on the other side, judges? What did the state put on to show that they could probably win this new motion to suppress? They didn't put on anything. They didn't put on any live evidence. They relied on evidence from the original hearing. We put on Pienta. They didn't. Of course, he took the fifth. They didn't even put on the state's attorney who took the statement. They relied on his prior testimony. So when we put it all together, the judge made manifest errors. He made manifest errors in how he looked at the evidence. He used the wrong standard with regard to the evidence, and ultimately he didn't look through the eyes of an objective judge looking at it now and say whether the result would probably be different. And instead, he turned it backwards and relied on Judge Cousins, who it would be interesting to ask him what he might have done if he had all this evidence in front of him. We actually did get an affidavit in another case from Judge Gillis who said, if I had all this evidence, I wouldn't have ruled the way I did. But that didn't happen in those cases. Even back at the beginning, Judge Cousins was surprised at what was going on when he pled guilty. He was. And then he changed. He said, I'm not guilty. Well, that's a whole other story. Yeah, in the case where Mr. Wuerl tried to bail out of his plea, and then Judge Cousins, using the power of the judiciary, said, well, you're going to trial at 2 o'clock this afternoon, and the plea changed again. But obviously, that plea needs to go out in the context of this case and in the context of this evidence, and Mr. Wuerl should get a new motion to suppress hearing. But that goes further. It does show there's some consistency in Mr. Wuerl's position in that right at the get-go, he was saying something. Yes, well, not only that, but you have to see that he had put on a full-fledged motion to suppress hearing before that, and he'd lost. So now that confession is coming in, and that's 99% of what they got against him, so that's why he's going to plea. I'll save anything additional. Unless the court has any questions right now, I'll save a little bit of time for rebuttal. Great. Thank you. Thank you. Mr. Stefanich. Thank you, Judge. Your Honors, Judge Alonzo didn't apply the wrong legal standard in this case. He applied the correct legal standard, and that standard was, and the issue before him was, was Mr. Wuerl, was the defendant tortured into confessing? And he looked at all the evidence, he looked at all the patterns. Why is that the issue? Because Mr. Taylor says the issue is, if all of this other evidence had been available at his original suppression hearing, the pattern of torture by Pienta, Pienta taking the fifth, all of this other information, would the outcome likely have been different? It's not whether we believe Sean Wuerl. Right, and that would the outcome likely be different comes from the People v. Patterson case. And in that case, the Illinois Supreme Court goes on to say at these PC torture hearings that you're supposed to evaluate the defendant's credibility and weigh that against this new evidence. So I think the first step is to evaluate the defendant's credibility. So let's look at those inconsistencies. You say the judge sees some inconsistencies about the potato chip bag and what color pants he was wearing. But if we hypothesize a new suppression hearing where the state has the burden by clearing convincing evidence to show that the injury he sustained in police custody did not produce his confession, how could the state prevail? Sure. I think the first step is that Mr. Wuerl didn't suffer an injury in police custody. He suffered an injury two days before on the L tracks. Okay, well, the witnesses, Pienta says the injury he saw in his leg was scabbed over. Correct. His mother says it was healing when she saw it. His brother says when he saw him at 3 a.m. after he had given his confession, it was an open sore, which required dressing at the hospital. Correct, Judge. But his mother also says that she saw the injury the day before, and Mr. Wuerl says he was at his girlfriend's house watching the news. And his brother says at the evidentiary hearing that he described the wound as looking like someone fell off the bike. And that's the same kind of description that Mr. Wuerl gave at the evidentiary hearing of what the injury was on the L tracks. So I think there are some inconsistencies there. So I think at the new suppression hearing, I don't think the testimony of the brother and the mother would carry the day. And then we would have the testimony of the ASA, Judge Stevens, who would testify that Mr. Wuerl told them that the injury occurred at the L tracks and that he didn't report any abuse to Judge Stevens and he gave the statement freely and voluntarily. Well, what kind of rate should anyone give to that, considering that if somebody is tortured, is he going to admit it or is she going to admit it to a prosecutor at that time, that place, having just gone through what allegedly he went through? I mean, that would be an incredible individual and contrary to human nature. Well, we see some of that, Judge. We see some of that in these real John Burge Area 2 cases where the defendant will say something to the state's attorney. The defendant will say something to the attorney. Some may, some may not. But that doesn't mean that we shouldn't discount. I don't think you should necessarily discount. Because you didn't tell him. After what he just went through, he believed what happened. Correct. And then he also didn't tell the intake paramedic. And, again, some of these other John Burge torture cases, they tell the intake paramedic. So what? You said some they do, some they do, some they don't. Right. So I would agree that you don't discount it entirely, but I think it weighs in the state's favor. I see it just the opposite. Why would it weigh in the state's favor? Because he didn't make that immediate outcry to... Well, why would he? I mean, again, this was all done, it was kept secret, it was not... It took years for all this to come out. Correct. You seem to be continuing to deny that these things have happened? We are. What's the role of the prosecutor here? To do justice, Judge. Do justice. Well, what's that mean in this case? In this case, it means to make Sean Royal prove his case by a preponderance of the evidence that he was tortured into confessing. And we don't think he did in this case. But shouldn't he have that chance? That's what we're talking about. Well, he did have that chance. Well, no, the judge didn't even consider, for example, that Piatra took the Fifth. He did consider that. He acknowledged that in his ruling. And I don't think he just gave it very much weight because before you take the adverse inference from the Fifth, there has to be some positive evidence that the fact that you want to take the adverse inference from. And in this case, there was no positive evidence because Mr. Royal was so impeached and was so incriminated. So impeached. If you go through each of those, why don't you go through them? Because I think the reply did a very good job of showing how incredibly minute and irrelevant each of those impeachments were. Sure. He was impeached on the – first, he was impeached in that he didn't raise this claim after the motions to suppress until 2010. So he didn't take a direct appeal. In his first PC, he raised an MSR issue. And then 18 years later, 19 years later was the first time he again raised the torture issue. He was impeached with a potato chip bag. He didn't mention that originally in his motion to suppress testimony. He didn't mention it in his written motion to suppress. When he did finally mention it the first time in his clemency petition, he said it was put over his mouth to muffle his screams. At the hearing, he said that didn't happen. It wasn't used to muffle his screams. It was used as a form of disrespect.  The location of the wound didn't match up with what his brother – where his brother said the wound was. Well, of course, we're – well, I mean, it really – it seems that the brother testified that – about the wound, that it was red, it was bleeding, as I recall. It would have been bleeding if it had happened a couple days before. Yeah, I think his brother testified it wasn't bleeding, but the defendant testified there were specks of blood. The brother said it was clotting, right? At the motion to suppress, correct, Judge? Right. No, clotting would mean that there had to be some blood there. At some point, right. Well, not at some point. At some point after it had – we were talking days after it had happened. Right. And the defendant also said that he didn't notice the blood because he was wearing red pants, and that just isn't true based on the picture of – Well, that was – what kind of pants were you wearing in 1990? Better. Particularly, to try to remember, you know, apparently he may have been wearing a red shirt, so maybe he got the shirt and pants back next time. I mean, this is – it really has nothing to do – the issue is whether an innocent man is in jail, and in this county, don't we care about an innocent man? And we look at the – the only thing they have him on is that confession, right? And the fingerprint. Well, the fingerprint – how did they find the fingerprint? He said he was in the car. Right. So that doesn't do a thing. Lots of people could have – he was in the car. He said he was in the car. But there are witnesses who say they saw two people in that car. And there's other testimony that could be used to show that he didn't do it. And he said he didn't do it right away. There's a lot of questions here. And you said the prosecutor is supposed to do justice. What are we trying to suppress? Why aren't we allowing this man to go forth? We did allow him to go forth with a PC hearing, Judge. Yeah. And that PC hearing was denied. Right. And I think it was denied – well, you said the judge didn't do anything wrong in denying it. Correct. And so it's okay that the judge didn't take account – I mean, just the loan on the Fifth Amendment, you don't think that's enough? Again, I think he did take that into account. He acknowledged that in his ruling. He just didn't draw the adverse inference that was requested of him. And they don't say – the defendant doesn't say any cases where the circuit court is required to do that. And then, Judge, if I could just briefly go back to the red pants issue. It's not that he was mixed up about whether his pants were red or blue. It was indirect. He testified that he didn't know if he was bleeding because of the red pants. And so I think that makes it more than just a minute inconsistency. It just seems when you're weighing that kind of impeachment versus the copper who won't even come in and testify, as a matter of weight, one is a little weightier than the other. Sure, Judge. Well, I think that's a good question. Obviously, when the cop takes the Fifth, that's not good evidence for the state. The same policeman that was involved in the Patterson case decided by our Supreme Court. Correct, Judge. But again, that was – the Patterson case was when John Burge was at Area 2. This isn't a case where John Burge was at Area 2. The Patterson case happened four years before this case. Just strikes me as a bit of a cruel coincidence. Why should we assume that if Pianta, according to the evidence, had been engaging in these tactics since the 70s, why should we assume he would stop when Burge left? I don't think you need to assume he would stop when Burge left, but I think the evidence showed that he didn't do it in this case because of Sean Will's testimony. And then when you look at the actual pattern and practice evidence that they presented, all their pattern and practice evidence, or most of it except for the Houston case, was when John Burge was there. So I think at best, they proved that the pattern and practice of abuse, of torture, at Area 2 when John Burge was in command there. But that isn't the case here. So if the court doesn't have any further questions. Thank you. Thanks. I realize I went into a lot of time ago not to step up and say I'll be brief. Say hello. You already are brief, right? Yes. Judge, I think that you pointed out very correctly, the question for these people as state's attorneys is how would you prove your case on a new motion to suppress? Would you call P. Antiff to take the Fifth Amendment? Would you call the other detectives to take the Fifth Amendment? You can't reach a burden. You had a chance to show in the record below that it wasn't probable that we could change the result on retrial. You didn't do it. Unfortunately, down the road, the court didn't use or add standards to evaluate that. But looking at it now through the lens, the correct legal lens, then of course on a new motion to suppress, at the very least, the outcome would probably be different. I would just say a couple of other things with regard to when we didn't tell the state's attorney that he was beaten. It's true. I represented Andrew Wilson. That was the exception that proved the rule, that Andrew Wilson actually did say to the state's attorney, they're beating me, they're torturing me. And what happened to Andrew Wilson? The state's attorney said, take him back in, and they tortured him again. And that's why people don't tell the state's attorney. They understand that the state's attorney is part of this program that's torturing them and trying to get them to give a confession. So in almost all the cases I've been involved in, they don't tell the state's attorney. And they use that, of course, but I think what the court said is the way to evaluate that evidence, and that is why would you tell the state's attorney? And the Fifth Amendment again. The Fifth Amendment is very important here. Counsel conceded that it's weightier than the impeachment with regard to Mr. Will, and I think that that alone requires a reversal here. But I would ask for the court to do more than just to send it back to the lower court to reevaluate this on the proper standard. I would ask the court to send it back for a new trial, to find that the evidence that we put forward is such that it's probable that the result will be different, and therefore, given that standard, we should have a new motion to suppress and not go through another hearing where the judge is on a PC where he's instructed to use the right standards. And with that, I would thank the court very much for its attentiveness, and thank you. I thank the party for the briefs and the arguments, a very significant case, and we are taking it under advisement and will issue an opinion directly. We're adjourned.